[Civ. No. 14434. Fourth Dist., Div. One. Jan. 6, 1977.]

MOUNTAIN DEFENSE LEAGUE et al., Plaintiffs and Appellants, v. BOARD OF SUPERVISORS OF SAN DIEGO COUNTY, Defendant and Respondent; LINCOLN MARTIN et al., Real Parties in Interest and Respondents.

724

726

**COUNSEL**

John D. Alspach and Harry N. Mixon for Plaintiffs and Appellants.

Robert G. Berrey, County Counsel, Donald L. Clark, Chief Assistant County Counsel, and Gregory C. M. Garratt, Deputy County Counsel, for Defendant and Respondent.

Ward, Jones, Aguirre & Seidenwurm, Gary J. Aguirre and William W. Ravin for Real Parties in Interest and Respondents.

**OPINION**

**BROWN (Gerald), P. J.**—The Mountain Defense League, an unincorporated association, and Byron F. Lindsley, Jr. appeal the judgment denying their petition for a writ of mandamus to direct the Board of Supervisors of San Diego County (Board) to deny Lincoln and Purvis Martin permission to proceed with their private development plan, PDP 72-10, and to rescind the conforming amendment of the San Diego County General Plan.

Our statement of the facts comes from the parties' settled statement. The Martins' proposed development as submitted to the Board included a 100-room lodge, a 20-room lodge, swimming pool, tennis courts, a restaurant and 100 two and one-half-acre homesites on about 1,000 acres of wooded, hilly land east of San Diego. Approval of the plan necessitated an acceptance of the environmental impact report (EIR) required under the CEQA (Pub. Resources Code, § 21000 et seq.) and an amendment of the general plan as required by Assembly Bill No. 1301 (Gov. Code, § 65300 et seq.). After the required hearings on the matter, the plan was approved by the Board; the Mountain Defense League petitioned the superior court for an alternative writ of mandate which was denied.

 Initially we must determine which standard of review should have been used in the trial court. If the action taken by the Board was legislative, then its decision should be tested by the arbitrary and capricious standard (Code Civ. Proc., § 1085; *Strumsky v. San Diego County Employees Retirement Assn.,* 11 Cal.3d 28, 34, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29]); however, if the decision was quasi-judicial in nature, either the independent judgment rule or the substantial evidence test is

proper (Code Civ. Proc., § 1094.5). When the independent judgment rule applies, the trial court makes its own independent findings, and review on appeal is directed to whether there is substantial evidence to support the court's findings (*Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301, 308 [196 P.2d 20]). On the other hand, if the substantial evidence test applies, both the trial and appellate courts limit their review to the question of whether the agency's findings were supported by substantial evidence (*Neely* v. *California State Personnel Bd.,* 237 Cal.App.2d 487, 489 [47 Cal.Rptr. 64]).

■ The independent judgment test is reserved for those situations where the administrative decision substantially affects a fundamental, vested right acquired by the petitioner (*Bixby* v. *Pierno,* 4 Cal.3d 130, 143-144 [93 Cal.Rptr. 234, 481 P.2d 242]; *Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d 28, 32). The question of what constitutes a fundamental, vested right must be answered on a case-by-case basis and considers not only the economic aspects involved but also "the effect . . . in human terms and the importance of it to the individual in the life situation." (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 144.) Even so, it is necessary to allege a deprivation of the right to property or to a livelihood (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 144).

Here the Defense League challenges the Board's amendment to the general plan which included the simultaneous approval of the private development plan.[1]

■ The adoption of a general plan, like the adoption of a zoning ordinance is a legislative function (Gov. Code, §§ 65300, 65850). In contrast, the granting or denial of a zoning variance, or a conditional use permit is an administrative, quasi-judicial act which is reviewed by the substantial evidence test (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles,* 11 Cal.3d 506, 512 [113 Cal.Rptr. 836, 522 P.2d 12]; *San Diego Bldg. Contractors Assn.* v. *City Council,* 13 Cal.3d 205, 212, fn. 5 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973]). No case law has been brought to our attention as to the type of judicial review which should be used in assessing decisions about general plan amendments. Where the county considers such amendments simultaneously with the adoption of PDP, the change in the general plan usually involves only one parcel. Thus, it would be easy to analogize general

---

[1]It is the policy and procedure of the Board to review private development plans and the general plan amendments which are needed for such development to occur at the same time so the evaluation of the project will include its impact on surrounding areas (Policy I-23). None of the parties challenged this procedure.

plan amendments to zoning variances and conclude the substantial evidence rule was proper. On the other hand, statutes on adopting the plan, a legislative function, include its amendment (Gov. Code, § 65350 et seq.); the size of the parcel here, about 1,000 acres, is more appropriately the subject of legislative rather than piecemeal administrative adjudication (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506, 522). However, having presented the issue, it is not necessary for us to decide it. ■ Where, as here, an agency in two capacities is simultaneously disposing of two legally required functions with but one decision, review of that determination must be by the more stringent standard. ■ Generally a legislative function involves the application of a rule in all future cases, whereas quasi-judicial action is the determination of specific rights under existing law with regard to a specific fact situation. Consideration of a PDP falls in the latter category and its denial or approval is a quasi-judicial act subject to the substantial evidence test.

■ The Defense League argues the trial court should have applied the most stringent test, the independent judgment test, in reviewing the Board's decision to approve the PDP and amend the general plan. As noted above, this standard is used only when the decision affects a fundamental, vested right of the petitioner (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 143-144). Here the Defense League asserts it has a right to the conservation and preservation of open space as embodied in the California Constitution[2] and Government Code section 65562.[3] It also asserts an economic stake in discouraging noncontiguous development.[4] To show their rights are vested the Defense League and Lindsley allege they have enjoyed the right to open space through hiking, camping and "simply viewing its pristine beauty." They say this right will be

---

[2]"It is in the best interest of the State to maintain, preserve, conserve and otherwise continue in existence open-space lands to assure the use and enjoyment of natural resources and scenic beauty for the economic and social well-being of the State and its citizens." (Repealed Nov. 5, 1974, See Gov. Code, § 65560 et seq.)

[3]Government Code section 65562 which states: "It is the intent of the Legislature in enacting this article: (a) To assure that cities and counties recognize that open-space land is a limited and valuable resource which must be conserved wherever possible. (b) To assure that every city and county will prepare and carry out open-space plans which, along with state and regional open-space plans, will accomplish the objectives of a comprehensive open-space program."

[4]Government Code section 65561, subdivision (b) states: "(b) That discouraging premature and unnecessary conversion of open-space land to urban uses is a matter of public interest and will be of benefit to urban dwellers because it will discourage noncontiguous development patterns which unnecessarily increase the costs of community services to community residents."

substantially affected since the development will "totally destroy" the open space.

■ A fundamental, vested right is one " 'which has been legitimately acquired or is otherwise "vested," and . . . is of a fundamental nature from the standpoint of its economic aspect or its "effect . . . in human terms and the importance . . . to the individual in the life situation." ' " (*Transcentury Properties, Inc.* v. *State of California*, 41 Cal.App.3d 835, 844 [116 Cal.Rptr. 487]). Fundamental vested rights include: the opportunity to continue practicing one's profession by having one's license restored (*Drummey* v. *State Bd. of Funeral Directors*, 13 Cal.2d 75, 85 [87 P.2d 848]); or the right to receive a service-connected death allowance (*Strumsky* v. *San Diego County Employees Retirement Assn., supra*, 11 Cal.3d 28, 45). However, an organization of taxpayers and surrounding property owners has no fundamental vested right in the granting or denial of a zoning variance (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra*, 11 Cal.3d 506, 510); a tentative subdivision map (*Friends of Lake Arrowhead* v. *Board of Supervisors*, 38 Cal.App.3d 497, 518, fn. 18 [113 Cal.Rptr. 539]); or a special use permit (*Jones* v. *City Council*, 17 Cal.App.3d 724, 728-729 [94 Cal.Rptr. 897]); the owners of Bay Bridge bonds have no fundamental vested right in preventing the construction of a second toll crossing on the San Rafael-Richmond Bridge (*Faulkner* v. *Cal. Toll Bridge Authority*, 40 Cal.2d 317, 323, 329-330 [253 P.2d 659]); a water district has no fundamental vested right to a permit to divert water from the San Jacinto River (*Temescal Water Co.* v. *Dept. of Public Works*, 44 Cal.2d 90, 103 [280 P.2d 1]). ■ Here Lindsley and the members of the Defense League make no allegations which connect them with the specific piece of land in question. They say they enjoy the open space by hiking through it, camping in it and looking at it. But, they have acquired no rights to do this on the Martins' property. Just as there is no vested right to obtaining a professional license, in contrast to having one revoked (*Dare* v. *Bd. of Medical Examiners*, 21 Cal.2d 790, 795 [136 P.2d 304]) or restored (*Drummey* v. *State Bd. of Funeral Directors, supra*, 13 Cal.2d 75, 85), so petitioners here have no vested right in having the Martins develop their land according to the petitioners' design. The trial court's use of the substantial evidence test in reviewing the Board's decision was proper.

■ The Defense League argues there is no substantial evidence to support the Board's decisions, questioning whether the Board considered the whole record, including contradictory as well as supporting evidence

(Code Civ. Proc., § 1094.5; *Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 144). It supports this contention with the EIR which the League says has "literally pages of adverse environmental impacts . . . [and] only three positive benefits." Here the three positive effects were: The development would reduce the threat of fires in the area; more than one-half of the property (some 650 acres) would be subject to a 20-year open space easement which would allow the public to use the property and at the end of 20 years the county would have an option to buy this acreage; the developer would engage in an accelerated reforestation program of that part of the property which was burned in 1972. This constitutes substantial evidence to support the Board's decision.

The Defense League complains the Board did not make findings as required by *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506). ■ There, the California Supreme Court concluded that an agency making a decision under Code of Civil Procedure section 1094.5 ". . . must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order. If the Legislature had desired otherwise, it could have declared as a possible basis for issuing mandamus the absence of substantial evidence to support the administrative agency's action. By focusing, instead, upon the relationships between evidence and findings and between findings and ultimate action, the Legislature sought to direct the reviewing court's attention to the analytic route the administrative agency traveled from evidence to action. In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route. Reference, in section 1094.5, to the reviewing court's duty to compare the evidence and ultimate decision to *'the* findings' (italics added) we believe leaves no room for the conclusion that the Legislature would have been content to have a reviewing court speculate as to the administrative agency's basis for decision." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles,* 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) However, these findings need not be formal and may be included as part of the agency's order (*Hadley* v. *City of Ontario,* 43 Cal.App.3d 121, 128 [117 Cal.Rptr. 513]). It is sufficient if they apprise "interested parties and the courts of the bases for the administrative action." (*San Francisco Ecology Center* v. *City and County of San Francisco,* 48 Cal.App.3d 584, 596 [122 Cal.Rptr. 100].) The Defense League claims appropriate findings were not made for the Board's approval of the PDP or its amendment of the general plan.[5] ■ However, here the two decisions were made

---

[5] If amending the general plan is a legislative function there would be no need for findings unless required by statute (see *Pitts* v. *Perluss,* 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83]).

simultaneously and under these circumstances only one set of findings is necessary if it covers all the requirements of both statutes. ■ The Board made no formal findings and we look to the minutes and the resolution of approval for informal findings which will apprise us of the basis of its action. There are none. Although the raw evidence supports the decision of the Board, there is nothing to bridge the gap between the evidence and the Board's resolution. The matter must be remanded for the Board to make the necessary findings to support its resolution (*Hadley* v. *City of Ontario, supra,* 43 Cal.App.3d 121, 128-129; *City of Fairchild* v. *Superior Court,* 14 Cal.3d 768, 779 [122 Cal.Rptr. 543, 537 P.2d 375]).

The Defense League argues the amendment to the general plan was illegal. Government Code section 65300[6] requires each city and county to adopt a general plan which should reflect the long-term general outline of projected development. It is, however, not a final document which is never to be changed, since amendments may be made when "in the public interest" (Gov. Code, § 65356.1). The Defense League maintains the amendment of the general plan through approval of PDP 72-10 was ad hoc, piecemeal, and frustrates and evades the requirement that the general plan be "comprehensive." However, at the time this decision was made, December 5, 1973, there was no statute limiting the number of times the general plan could be amended.[7] ■ The fact the Legislature did not then place limitations on the frequency of amending the general plan and now permits it three times per year shows that the Legislature did not expect the county to view the general plan as a theoretical planning instrument which was to be reviewed only every couple of years. The fact the Legislature placed no limits on the acreage involved in an amendment, combined with its allowing unlimited amendments to the plan, shows it contemplated the procedure which the Defense League finds objectionable.

The Defense League questions the county's policy of amending the general plan to accommodate a developer's project. In other words, it contends the plan first should be amended and the developer then

[6]Government Code section 65300 reads: "Each planning agency shall prepare and the legislative body of each county and city shall adopt a comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning."

[7]As of January 1, 1974 Government Code section 65361 limited the frequency of general plan amendment saying: "No mandatory element of a general plan shall be amended more frequently than three times during any calendar year, which amendment or amendments may occur at any time as determined by the legislative body. This section shall not apply to the adoption of any element to the general plan."

should make his project consistent with it, rather than adopting the two simultaneously or approving the project first and then amending the general plan to be consistent with it. The problem of consistency arises because of the 1970 passage of Assembly Bill No. 1301 (Stats. 1971, ch. 1446) which requires that zoning (Gov. Code, § 65860) and subdivision maps (Gov. Code, § 66473.5) be consistent with the general plan. However, Assembly Bill No. 1301 did not take effect until after the decision in this case. In addition, approval of the PDP here did not entail a zoning change nor a subdivision map. Rather, the PDP serves as a specific plan (Gov. Code, § 65450 et seq.). Approval of the PDP is only the first of many approvals the developer must obtain before he begins construction.

■ The Defense League argues this amendment to the general plan is not "in the public interest" as required by Government Code section 65356.1.[8] The application here did not require a change in zoning. However, it did necessitate a change in the general plan from permanent open space to rural residential which the League says contradicts the Legislature's intent when it made open-space a mandatory element of the plan.[9] However, the change in classification here means the approximately 1,000 acres which were privately owned and, thus, unavailable for public use will become about 400 acres reserved for

---

[8]This statute in pertinent part reads: "When it deems it to be in the public interest the legislative body may change or add to all or a part of an adopted general plan . . . ."

[9]Government Code section 65561 setting out the legislative findings states:

"The Legislature finds and declares as follows:

"(a) That the preservation of open-space land, as defined in this article, is necessary not only for the maintenance of the economy of the state, but also for the assurance of the continued availability of land for the production of food and fiber, for the enjoyment of scenic beauty, for recreation and for the use of natural resources.

"(b) That discouraging premature and unnecessary conversion of open-space land to urban uses is a matter of public interest and will be of benefit to urban dwellers because it will discourage noncontiguous development patterns which unnecessarily increase the costs of community services to community residents.

"(c) That the anticipated increase in the population of the state demands that cities, counties, and the state at the earliest possible date make definite plans for the preservation of valuable open-space land and take positive action to carry out such plans by the adoption and strict administration of laws, ordinances, rules and regulations as authorized by this chapter or by other appropriate methods.

"(d) That in order to assure that the interests of all its people are met in the orderly growth and development of the state and the preservation and conservation of its resources, it is necessary to provide for the development by the state, regional agencies, counties and cities, including charter cities, of statewide coordinated plans for the conservation and preservation of open-space lands.

"(e) That for these reasons this article is necessary for the promotion of the general welfare and for the protection of the public interest in open-space lands."

private use and 600 acres for public use. This increase in land which can be used by the public is in the "public interest."[10]

The Defense League also points to the Guidelines for Local General Plans State of California (Council on Intergovernmental Relations, Sept. 20, 1973) which states, "All proposed changes . . . [to the general plan] should be evaluated in regard to environmental impact and consistency with the balance of the document." However, as the Defense League states, these guidelines are merely advisory and in no way mandatory. The amendment to the general plan was proper.

The Defense League questions the Board's adoption of PDP 72-10 when there were adverse environmental effects set out in the EIR. It admits that nowhere in the CEQA are there express requirements that developmental plans, which have a negative impact on the environment, be rejected (*San Francisco Ecology Center* v. *City and County of San Francisco, supra,* 48 Cal.App.3d 584, 589). However, it suggests that if such a project is to be approved, the Board should be required to support its decision with specific findings to show the potential economic and social benefits outweigh the environmental costs. The balancing of these considerations should be included in the findings required under *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506; see also *People* v. *County of Kern,* 39 Cal.App.3d 830, 841-842 [115 Cal.Rptr. 67]).

The judgment is reversed and the trial court is directed to issue a writ of mandate ordering the Board of Supervisors of San Diego County to make findings in support of its resolution of December 5, 1973 consistent with the views expressed in this opinion.

Ault, J., and Cologne, J., concurred.

A petition for a rehearing was denied January 20, 1977, and appellants' petition for a hearing by the Supreme Court was denied March 3, 1977.

---

[10] In addition, there is a problem which the Defense League does not raise and we do not address. If the owner here is not allowed to do anything with his property except keep it as open space, there is a possible question of inverse condemnation.