[Civ. No. 24836. Fourth Dist., Div. One. Sept. 13, 1983.]

L & M PROFESSIONAL CONSULTANTS, INC.,
Plaintiff and Respondent, v.
FRANK E. FERREIRA et al., Defendants and Appellants.

FRANK E. FERREIRA et al., Plaintiffs and Appellants, v.
CITY OF CHULA VISTA et al., Defendants and Respondents.

COUNSEL

Jenkins & Perry, Michael B. Poynor and Karen J. Headley for Defendants and Appellants and Plaintiffs and Appellants.

Gray, Cary, Ames & Frye, Richard A. Paul, Thomas J. Harron and George D. Lindberg for Plaintiff and Respondent and for Defendants and Respondents.

OPINION

**WIENER, J.**—In September 1979 the Chula Vista City Council (Council) adopted a resolution consenting to the private condemnation by L & M Professional Consultants, Inc. (L & M) of an appurtenant easement for sewer and storm drainage across property owned by Frank E. Ferreira (Ferreira) and Milgen Investment Company (Milgen). L & M then filed an eminent domain action to acquire the easement under the authority of Civil Code section 1001 and Code of Civil Procedure section 1245.325.[1] Ferreira and Milgen unsuccessfully petitioned the superior court to invalidate the

---

[1]All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Council's resolution of consent and to declare Civil Code section 1001 unconstitutional. The court also found in favor of L & M in the eminent domain action and entered a judgment of condemnation for the easement. Ferreira and Milgen appeal both judgments.

Among their many arguments Ferreira and Milgen contend Civil Code section 1001 and section 1245.325 are unconstitutional both on their face and as applied. They also argue the Council denied them due process in the hearings it conducted before consenting to L & M's proposed condemnation, and again challenge the validity of the Council's resolution of consent. Finally, Ferreira and Milgen argue the lower court erroneously applied the legal rather than market rate of interest to their condemnation award. As we shall explain, we reject these arguments and affirm the judgments.

I

FACTUAL AND PROCEDURAL BACKGROUND

We narrate the facts in some detail because of the substantial evidence review required by Ferreira's and Milgen's challenge to the validity of the Council's resolution of consent. (See part III C, *post.*)

In 1978 L & M purchased 10.9 acres of essentially undeveloped hillside property in Chula Vista commonly known as Villa San Miguel for $1,115,000. The property slopes downward in a northerly and northeasterly direction. Ferreira owns or controls all the property on Villa San Miguel's northern and eastern borders. Vehicular access to Villa San Miguel is from the southwest via Hilltop Drive. Stands of mature palm, pine and eucalyptus trees populate the property in the higher elevations near its southern border.

In late 1978 L & M began to prepare a tentative map for the construction of 18 expensive homes at Villa San Miguel. Chula Vista city planners set several guidelines for L & M's project, including the preservation of the property's mature trees and rural character and the avoidance of extensive grading. These guidelines, combined with the property's topography, precluded gravity sewerage and drainage to Hilltop Drive. Consequently, L & M's tentative map proposed locating a sewer easement across Ferreira property north of Villa San Miguel. Drainage was to be onsite.

In early 1979 the Chula Vista Planning Commission and the Council held separate public hearings on L & M's tentative map. Ferreira and his attorney each spoke at both hearings in opposition to L & M's project. They criticized the lack of offsite drainage for the project and described a history

of flooding and drainage problems on Ferreira properties resulting from rain water flowing north off of Villa San Miguel. They also claimed L & M's proposed sewer easement would interfere with existing underground utilities. The Council approved L & M's tentative map after L & M agreed to provide offsite drainage and to relocate the sewer easement across a vacant lot northeast of Villa San Miguel. The lot is 0.89 acres in size and had a 1978-1979 assessed value of $10,600. Ferreira and Milgen own the lot through a partnership in which Ferreira acts as the managing partner.

Following the Council's approval of the tentative map, L & M and Ferreira discussed locations for a sewer and storm drainage easement across Ferreira's and Milgen's property. L & M proposed three locations and Ferreira proposed one. After negotiations proved fruitless, L & M sought Council consent to its condemnation of an easement across Ferreira's and Milgen's property. The Council noticed a hearing on L & M's proposed condemnation and then postponed the hearing for three weeks at Ferreira's request.

The postponed hearing convened on August 14, 1979. The hearing transcript is lengthy and shows Ferreira and his attorney each participated extensively, as did Ferreira's engineer. The Council heard testimony and received maps and diagrams describing three alternatives: a "red easement" location proposed by L & M, a "blue easement #1" location proposed by Ferreira and a "no-condemnation" proposal by Ferreira for development of Villa San Miguel with gravity sewerage and drainage to Hilltop Drive. Ferreira also presented his plans to develop a 27-unit apartment complex on his and Milgen's property, and described the initial work (site planning and retaining wall) he had completed on that project. After the parties completed their comments, the Council closed the public hearing and deferred taking action for two weeks to allow its staff additional time to study Ferreira's development plans and blue easement #1 proposal.

On August 28, 1979, the Council reconvened. Ferreira and his attorney again were present. Council staff presented an evaluation of the three alternatives discussed on August 14. The staff also commented on a "blue easement #2" location Ferreira proposed to them during the two-week continuance. After the staff's comments, and without allowing further public testimony, the Council adopted the staff's recommendation to approve L & M's condemnation of a 10-foot wide sewer and storm drainage easement at Ferreira's blue easement #1 location. One week later the Council unanimously adopted a corresponding resolution of consent. (§§ 1245.330, 1245.360.)

The Council rejected Ferreira's no-condemnation proposal because it would have required importing 80,000 cubic yards of fill costing more than $500,000 and clustering the 18 homes near Hilltop Drive rather than spreading them out on large lots. The Council also rejected Ferreira's blue easement #2 proposal because it would have violated a city ordinance requiring open space above easements, thus creating a serious service and maintenance problem for the city. As between the red easement and blue easement #1 proposals, the Council selected the latter alternative after Ferreira's attorney testified on August 14 that it would "create the least damage" to development plans for Ferreira's and Milgen's property and would "not in any way interfere with the highest and best use of that property." L & M estimated its condemnation and utility installation costs at the blue easement #1 location would be $106,000, approximately double its estimated costs at the red easement location.

In September 1979 L & M filed an action to condemn the easement approved by the Council and deposited the probable compensation for the easement. (§ 1255.010.) In October L & M obtained an order for possession of the easement as of mid-November. (§ 1255.410.) Ferreira and Milgen did not withdraw the deposited compensation (§ 1255.210) or seek a stay of the order for possession. (§§ 1255.420, 1255.430.) Instead, they petitioned the superior court in December for a writ of mandate (§ 1094.5) ordering the Council to rescind its resolution of consent and declaring Civil Code section 1001 unconstitutional. In May 1981 the lower court entered a judgment on an order denying Ferreira's and Milgen's petition. Five months later the court entered a judgment for L & M condemning the easement approved by the Council. That judgment required L & M to pay Ferreira and Milgen $8,400 compensation for the easement plus 7 percent legal interest on that amount from mid-November 1979. (§ 1268.310, subd. (c).) One month after the judgment of condemnation was entered L & M deposited the balance due Ferreira and Milgen under the judgment. (§ 1268.110.) Sometime after making that deposit L & M took possession of the condemned easement. This appeal ensued.

## II

### CONSTITUTIONALITY OF PRIVATE CONDEMNATION STATUTES

#### A

#### *Legislative History and Intent*

In 1975 the Legislature enacted a thoroughly revised and recodified eminent domain law. (§ 1230.010 et seq.) Before that enactment former

Civil Code section 1001 authorized private persons to condemn private property for any public use listed in former section 1238. (Stats. 1970, ch. 662, § 1, pp. 1285-1288; Recommendation Proposing the Eminent Domain Law (Dec. 1974) 12 Cal. Law Revision Com. Rep. (1974) p. 1634.) The 1975 eminent domain law abolished all private condemnation authority, except for that exercised by privately owned public utilities and five types of quasi-public entities. (Recommendation Relating to Condemnation for Byroads and Utility Easements (Oct. 1975) 13 Cal. Law Revision Com. Rep. (1976) p. 1475.) The Legislature considered the former law constitutionally suspect because it seemed to authorize private condemnation for predominantly private purposes. (Sen. Legis. Com. com., 1976 Repeal of § 1238, 19 West's Ann. Code Civ. Proc., pp. 452, 463, 465-466.) With the advent of the new law private persons seeking the extension of utility service to their property could request the appropriate public entity undertake the necessary condemnation on their behalf. (*Id.,* at pp. 452, 456, 468.) This approach, however, proved unworkable due to the reluctance or unwillingness of many public entities to condemn utility easements on behalf of private persons. (Recommendation Relating to Condemnation for Byroads and Utility Easements (Oct. 1975) 13 Cal. Law Revision Com. Rep., *supra,* at p. 1476.) Consequently, the Legislature in 1976 restored private condemnation authority to owners of private property for the limited purpose of acquiring appurtenant easements to provide utility service to their property. This authority, codified in Civil Code section 1001 and section 1245.325, is designed to serve ". . . the function of opening what would otherwise be landlocked property to enable its most beneficial use. As a practical matter, land to which utility service cannot be extended . . . cannot be developed." (*Id.,* at pp. 1475-1476, fn. omitted.) Toward that end, Civil Code section 1001 provides:

"(a) As used in this section, 'utility service' means water, gas, electric, drainage, sewer, or telephone service.

"(b) Any owner of real property may acquire by eminent domain an appurtenant easement to provide utility service to the owner's property.

"(c) In lieu of the requirements of Section 1240.030 of the Code of Civil Procedure, the power of eminent domain may be exercised to acquire an appurtenant easement under this section only if all of the following are established:

"(1) There is a great necessity for the taking.

"(2) The location of the easement affords the most reasonable service to the property to which it is appurtenant, consistent with the least damage to the burdened property.

"(3) The hardship to the owner of the appurtenant property, if the taking is not permitted, clearly outweighs any hardship to the owner of the burdened property." In like manner, section 1245.325 provides:

"Where an owner of real property seeks to acquire an appurtenant easement by eminent domain pursuant to Section 1001 of the Civil Code:

"(a) The person seeking to exercise the power of eminent domain shall be deemed to be a 'quasi-public entity' for the purposes of this article.

"(b) In lieu of the requirements of subdivision (c) of Section 1245.340, the resolution required by this article shall contain a declaration that the legislative body has found and determined each of the following:

"(1) There is a great necessity for the taking.

"(2) The location of the easement affords the most reasonable service to the property to which it is appurtenant, consistent with the least damage to the burdened property.

"(3) The hardship to the owner of the appurtenant property, if the taking is not permitted, clearly outweighs any hardship to the owner of the burdened property."

## B

### *Facial Constitutionality—Great Necessity*

■ To prevent abuses which had been possible under the former eminent domain law, the Legislature made the new private condemnation authority subject to several limitations. (Recommendation Relating to Condemnation for Byroads and Utility Easements (Oct. 1975) 13 Cal. Law Revision Com. Rep., *supra,* at pp. 1476-1477.) One of those limitations is that a "great necessity" must exist for the proposed taking. (Civ. Code, § 1001, subd. (c)(1); § 1245.325, subd. (b)(1).) This limitation replaces the usual "public interest and necessity" requirement (§§ 1240.030, subd. (a), 1245.230, subd. (c)(1), 1245.340, subd. (c)(1)) with a stricter standard applicable only to the private condemnation of utility easements. (Civ. Code, § 1001, subd. (c); § 1245.325, subd. (b); see Cal. Law Revision Com. coms., 1976 addition, 7 West's Ann. Civ. Code (1982 ed.) § 1001, p. 573 and 19 West's Ann. Code Civ. Proc. (1982 ed.) § 1245.325, p. 606.)

■ Ferreira and Milgen contend Civil Code section 1001, subdivision (c)(1) and section 1245.325, subdivision (b)(1) are unconstitutionally vague

because they do not contain a specific standard for determining when a "great necessity" exists for the private condemnation of a utility easement.[2] ■ We consider this argument in light of the principles that ". . . enactments should be interpreted when possible to uphold their validity [citation], and . . . courts should construe enactments to give specific content to terms that might otherwise be unconstitutionally vague. [Citations.]" (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 598 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) We must, of course, look to legislative intent in providing such content so that the purpose of the statutes will be achieved. (*People* v. *Shirokow* (1980) 26 Cal.3d 301, 306-307 [162 Cal.Rptr. 30, 605 P.2d 859].)

■ As noted above, the Legislature enacted Civil Code section 1001 and section 1245.325 to enable the development of private property to its most beneficial use. Whether and how utility service can be provided to a piece of property typically depend on a number of factors, including applicable land use regulations, environmental impacts of development, anticipated service requirements, physical characteristics of the property and various cost/benefit considerations. Usually these requirements can be satisfied and utility service provided without resort to private condemnation. Occasionally, however, the necessary conditions for providing service without condemnation cannot all be met. ■ Here, for example, Ferreira's no-condemnation proposal would have required importing 80,000 cubic yards of fill costing more than $500,000 and clustering the 18 homes near Hilltop Drive rather than spreading them out on large lots. This approach would have violated development and environmental guidelines established by Chula Vista city planners and would have been inordinately expensive in light of total project development costs which, at the time of trial, were expected to reach approximately $6.8 million. Under these circumstances, Ferreira's no-condemnation proposal was not a reasonably acceptable means for providing utility service to Villa San Miguel. Stated another way, a "great necessity" existed for L & M's condemnation of a sewer and storm drainage easement across Ferreira's and Milgen's property because, without such an easement, Villa San Miguel could not be developed.

As illustrated by this case, determining whether a "great necessity" exists for the private condemnation of a utility easement does not turn on a comparative evaluation of condemnation and noncondemnation alternatives. "Great necessity" does not exist when a condemnation alternative is more

---

[2]Ferreira and Milgen also spend one page of their reply brief arguing the other requirements of Civil Code section 1001, subdivision (c) and section 1245.325, subdivision (b) are unconstitutionally vague. We do not address these contentions because they do not merit discussion.

preferable than a reasonably acceptable noncondemnation alternative. Under such circumstances a piece of property is not "otherwise" landlocked. (See Recommendation Relating to Condemnation for Byroads and Utility Easements (Oct. 1975) 13 Cal. Law Revision Com. Rep., *supra,* at pp. 1475-1476.) "Great necessity" exists only when a condemnation alternative is the sole reasonably acceptable means for providing utility service to a piece of property.[3] This interpretation is consistent with the rationale of *Linggi* v. *Garovotti* (1955) 45 Cal.2d 20 [286 P.2d 15], a landmark private condemnation case which explained a "somewhat stronger showing" of necessity must be made for the private condemnation of a utility easement. (*Id.*, at p. 27.) Although the Supreme Court held Linggi's general allegation of necessity for his proposed sewer easement was sufficient to survive a demurrer, it observed Linggi upon a trial ". . . might be denied the easement which he is endeavoring to obtain if [an]other remedy is available to him which would be less injurious to private property. For example, the evidence may show that the proper public authorities have not been asked to enlarge the present facilities in [front of Linggi's property] and make that line adequate to carry off all of the sewage from Linggi's property. [Citation.]" (*Ibid.*) Thus, Linggi would be denied his proposed easement if a reasonably acceptable noncondemnation alternative was available to provide sewer service to his property.[4] Because such an alternative was not available here, the Council correctly determined a "great necessity" existed for L & M's condemnation of a sewer and storm drainage easement across Ferreira's and Milgen's property.

## C

### *Facial Constitutionality—Public Use*

Ferreira and Milgen next point out Civil Code section 1001 and section 1245.325 do not require utility easements be taken only for public uses. They argue these omissions violate the United States and California

---

[3]The "great necessity" language in Civil Code section 1002, subdivision (a)(1) governs the acquisition of temporary rather than permanent interests in neighboring lands. These two types of situations are significantly different and thus require different standards for determining when the acquisition of such interests is appropriate. Consequently, the "great necessity" standards contained in Civil Code section 1002, subdivision (a)(1) are not pertinent to our interpretation of Civil Code section 1001, subdivision (c)(1) and section 1245.325, subdivision (b)(1).

[4]The court concluded by noting "[t]he proposed route may not be the most direct one [across Garovotti's property] to reach the line in [back of Linggi's property], or possibly another route, although less direct, might be less injurious to all property owners concerned." (*Ibid.*) These comments address the selection of an easement location once a "great necessity" for taking the easement has been shown. (See Civ. Code, § 1001, subd. (c)(2); § 1245.325, subd. (b)(2).)

Constitutions in two ways. First, the omissions violate the Constitutions' requirements that private property be condemned only for public uses. (U.S. Const., Amends. V, XIV, § 1; Cal. Const., art. I, § 19; see generally McDonald & Noll, *Review of Selected 1976 California Legislation* (1977) 8 Pacific L.J. 165, 462-463.) Second, the omissions create two groups of property owners: those subject to takings by quasi-public entities whose powers of eminent domain are limited to public uses (§ 1245.320), and those subject to takings by quasi-public entities whose condemnation powers are not so limited. (§ 1245.325.) This classification denies the second group of property owners the equal protection of the laws. (U.S. Const., Amend. XIV, § 1; Cal. Const., art. I, § 7, subd. (a).) In considering these arguments we must construe the challenged statutes in context and harmonize them with companion provisions of an overall statutory system. (*People* v. *Shirokow, supra,* 26 Cal.3d at p. 307.)

The above arguments wrongly assume public use requirements should have been included in Civil Code section 1001 and section 1245.325. In these statutes the Legislature empowered private property owners to acquire utility easements by eminent domain. These provisions thus constituted a legislative declaration that the private condemnation of utility easements is for a public use. (§ 1240.010.) It was therefore unnecessary to include requirements which such takings satisfy by definition. Even so, the Legislature did include public use requirements applicable to such takings in other provisions of the new eminent domain law. Civil Code section 1001, subdivision (c) supplants the specific requirements of section 1240.030. However, it does not abrogate the fundamental public use limitation applicable to all takings by public and quasi-public entities. (§§ 1240.010, 1245.380; see Law Revision Com. com., 1976 addition, 7 West's Ann. Civ. Code, *supra,* § 1001, p. 573.) Similarly, section 1245.325, subdivision (b) supplants only the requirements of section 1245.340, subdivision (c). The public use limitation of section 1245.340, subdivision (a) still applies to all takings by quasi-public entities. (See Law Revision Com. com., 1976 addition, 19 West's Ann. Code Civ. Proc., *supra,* § 1245.325, p. 606.) Civil Code section 1001 and section 1245.325 are not facially unconstitutional for allowing the condemnation of private property for private uses.

## D

### *Contitutionality as Applied—Public Use*

Ferreira and Milgen further argue Civil Code section 1001 and section 1245.325 are unconstitutional as applied in this case. They argue L & M will profit from its development of an exclusive residential neighborhood,

and thus its condemnation of their property is for a private rather than a public use. There is no question, however, that L & M intends to use its easement to provide sewer and storm drainage service to Villa San Miguel. "[I]t is clear that the ordinary taking of private property for the purpose of constructing storm drainage systems is a taking for a public use." (*Bauer v. County of Ventura* (1955) 45 Cal.2d 276, 284 [289 P.2d 1]; see also *Marin v. City of San Rafael* (1980) 111 Cal.App.3d 591, 595 [168 Cal.Rptr. 750]; 2A Nichols on Eminent Domain (3d rev. ed. 1981) § 7.5155, p. 7-179.) Condemnation of private property to provide sewer service also is a taking for a public use. (See *City of Oakland v. Oakland Raiders* (1982) 32 Cal.3d 60, 71-72 [183 Cal.Rptr. 673, 646 P.2d 835]; *Linggi v. Garovotti, supra,* 45 Cal.2d at pp. 23-26; 2A Nichols on Eminent Domain, *supra,* § 7.5154.) "Once it is determined that the taking is for a public purpose, the fact that private persons may receive benefit is not sufficient to take away from the enterprise the characteristics of a public purpose. [Citations.]" (*Redevelopment Agency v. Hayes* (1954) 122 Cal.App.2d 777, 804 [266 P.2d 105], cert. den., 348 U.S. 897 [99 L.Ed. 705, 75 S.Ct. 214]; see, e.g., *County of Los Angeles v. Anthony* (1964) 224 Cal.App.2d 103, 106-107 [36 Cal.Rptr. 308], cert. den., 376 U.S. 963 [11 L.Ed.2d 981, 84 S.Ct. 1125], rehg. den., 377 U.S. 940 [12 L.Ed.2d 304, 84 S.Ct. 1333]; *City of Carlsbad v. Wight* (1963) 221 Cal.App.2d 756, 759-760 [34 Cal.Rptr. 820].) Under these authorities we conclude Civil Code section 1001 and section 1245.325 are not unconstitutional as applied in this case.

## III

### VALIDITY OF COUNCIL'S CONSENT

#### A

*Nature of Council's Act*

■ The nature of the Council's act in consenting to L & M's condemnation presents an important threshold question. If that act was adjudicative rather than legislative, then procedural due process requirements apply (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 612-613 [156 Cal.Rptr. 718, 596 P.2d 1134]) and judicial review of the Council's decision to consent is by administrative (§ 1094.5) rather than traditional (§ 1085) mandamus. (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].) Arguably, the function the Council performed by its act was, in substance, the exercise of its power of eminent domain. (See § 1245.330.) That power is an inherent attribute of sovereignty (*City of Oakland v. Oakland Raiders, supra,* 32

Cal.3d at p. 64; 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 529, subd. (a), p. 3828) and its exercise is a legislative act under both federal (*Joiner* v. *City of Dallas* (N.D.Tex. 1974) 380 F.Supp. 754, 764-766, 769-771, affd., 419 U.S. 1042 [42 L.Ed.2d 637, 95 S.Ct. 614], rehg. den., 419 U.S. 1132 [42 L.Ed.2d 831, 95 S.Ct. 818]; see generally 1 Nichols on Eminent Domain (3d rev. ed. 1981) § 4.11, pp. 4-138 to 4-153) and California Law (*People* v. *Chevalier* (1959) 52 Cal.2d 299, 304 [340 P.2d 598]; *Wulzen* v. *Board of Supervisors* (1894) 101 Cal. 15, 21 [35 P. 353]). Thus, under one line of cases, the Council's act was legislative. (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 834 [377 P.2d 83]; *City of Chula Vista* v. *Superior Court* (1982) 133 Cal.App.3d 472, 486 [183 Cal.Rptr. 909]; *Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 280 [63 Cal.Rptr. 889].) Given, however, the particularity of the Council's decision and the small size and number of parcels involved and relatively few property owners affected, its act may have been adjudicative. (*Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 168 [188 Cal.Rptr. 104, 655 P.2d 306]; *Horn* v. *County of Ventura, supra,* 24 Cal.3d at pp. 612-614; but see *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 514, 516-519, 522-523 [169 Cal.Rptr. 904, 620 P.2d 565].) Faced with this uncertainty the Council took the prudent course by treating its act as adjudicative. (See *Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723, 729 [135 Cal.Rptr. 588].) Because we conclude the Council's decision to consent withstands scrutiny under the stricter standards applicable to adjudicative acts, we do not resolve the threshold classification issue.

## B

### Due Process

■ "Due process principles require reasonable notice and opportunity to be heard before governmental *deprivation* of a significant property interest. [Citations.]" (*Horn* v. *County of Ventura, supra,* 24 Cal.3d at p. 612, citing California and federal cases, italics added.) Such principles apply to temporary as well as final deprivations of property. (*Brooks* v. *Small Claims Court* (1973) 8 Cal.3d 661, 666-667 [105 Cal.Rptr. 785, 504 P.2d 1249], citing California and federal cases). ■ Viewed from a practical standpoint, the Council's act in consenting to L & M's condemnation did not deprive Ferreira and Milgen, even temporarily, of any interest in their property. The final deprivation resulted from the entry of the lower court's judgment of condemnation. Before that, no temporary deprivation occurred. Although L & M obtained an order for possession as of mid-November 1979, Ferreira and Milgen challenged that order through their mandamus

proceeding (see Assem. Legis. Com. com., 1975 addition, 19 West's Ann. Code Civ. Proc., *supra,* § 1255.410, pp. 705-706) and remained in possession until after L & M deposited the balance due them under the judgment of condemnation. Thus the practical effect of the Council's act was simply to authorize L & M to commence a private condemnation action against Ferreira and Milgen. In that action L & M bore the burden of proving the propriety of its proposed taking. (See *Linggi* v. *Garovotti, supra,* 45 Cal.2d at p. 27; Recommendation Relating to Condemnation for Byroads and Utility Easements (Oct. 1975) 13 Cal. Law Revision Com. Rep., *supra,* at p. 1477; compare § 1245.250.) Ferreira and Milgen do not contend the lower court denied them a reasonable opportunity to be heard during the trial of L & M's condemnation action.

As noted above, the Council treated its decision to consent as an adjudicative act, and even though there was no deprivation of property, procedural due process requirements applied. (*Horn* v. *County of Ventura, supra,* 24 Cal.3d at pp. 612-613.) Ferreira and Milgen argue the Council denied them due process by not allowing them to discuss the blue easement #2 proposal at the August 28 hearing. They concede they had a reasonable opportunity to be heard regarding the three alternatives considered on August 14.

There is an inherent tension in a hearing procedure such as the Council conducted between encouraging a full exploration of utility service alternatives and reaching a timely decision regarding whether to adopt a resolution of consent. The basic issues the decisionmaking agency (§ 1245.310) should address through such a procedure are whether to consent to a proposed taking and, if so, to determine the appropriate location for the taking. The Council considered both issues on August 14. Having received adequate notice and a three-week postponement of the August 14 hearing, and having previously negotiated with L & M regarding its proposed condemnation of a utility easement across their property, there was no reason for Ferreira and Milgen to present to the Council on August 14 anything less than a comprehensive statement of their position. They did in fact contest both the necessity and appropriate location for L & M's proposed condemnation. Having spoken to the basic issues to be addressed, the fact Ferreira and Milgen later had another idea for a different location does not mean they had a due process right to another hearing. (See *Dami* v. *Dept. Alcoholic Bev. Control* (1959) 176 Cal.App.2d 144, 151 [1 Cal.Rptr. 213].) To hold they had such a right would be to hold the requirement of a reasonable opportunity to be heard includes the right, in effect, to have the last word in a decision making agency's hearing procedure. Were that the law, decisions regarding whether to adopt resolutions of consent could be endlessly delayed by the inadvertent omissions or deliberate strategies of prospective

condemnees. Due process cannot become a vehicle for bringing the process of government to a halt. (*Ibid.*) The Council's hearing procedure did not violate Ferreira's and Milgen's due process rights.[5]

## C

### *Validity of Council's Resolution*

■ An administrative decision which "substantially affects fundamental vested rights" (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144 [93 Cal.Rptr. 234, 481 P.2d 242]) invokes judicial review under the independent judgment rule of section 1094.5. Other adjudicative acts are subject to review under that section's substantial evidence test. (*Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d at pp. 32, 44-45.) ■ We are satisfied Ferreira's and Milgen's interests in their property represented "fundamental vested rights." (See *Unterthiner* v. *Desert Hospital Dist.* (1983) 33 Cal.3d 285, 294-296 [188 Cal.Rptr. 590, 656 P.2d 554]; *Mountain Defense League* v. *Board of Supervisors, supra,* 65 Cal.App.3d at pp. 728, 730.) The Council's act in consenting to L & M's condemnation, however, did not "substantially affect" those rights because, as explained above (see part III B), it did not deprive Ferreira and Milgen of any interest in their property. (See *ibid.*; see also *Bixby* v. *Pierno, supra,* 4 Cal.3d at pp. 144-147.) Consequently, the substantial evidence test applies to our review of the Council's decision to consent.

■ In applying the substantial evidence test ". . . a reviewing court . . . must scrutinize the record and determine whether substantial evidence supports the administrative agency's findings and whether these findings support the agency's decision. In making these determinations, the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12].) So long as they are sufficient to apprise a reviewing court of the basis for the agency's decision (*id.,* at pp. 514, 517, fn. 16), the necessary findings may be formal or informal and may be contained in the agency's order or decision. (*Hadley* v. *City of Ontario* (1974) 43 Cal.App.3d 121, 128 [117 Cal.Rptr. 513].)

■ The Council's findings appear in the text of its resolution of consent. We have reproduced that resolution in an appendix to this opinion,

---

[5]Given Ferreira's and Milgen's constitutional rights to be heard were not violated, it follows their counterpart statutory rights (§ 1245.350, subd. (a)) also were not violated. (See *Franchise Tax Board* v. *Superior Court* (1950) 36 Cal.2d 538, 549 [225 P.2d 905].)

with paragraph numbers added in brackets for easy reference. The findings contained in the resolution satisfy all applicable statutory requirements and thus support the Council's decision to consent. Paragraphs 6 through 9 generally describe the public uses to be served by L & M's easement (§§ 1240.010, 1245.340, subd. (a)), and paragraph 11 identifies the statutory authority for L & M's condemnation of that easement (§ 1245.340, subd. (a)). Paragraphs 1, 9 and 10, with accompanying exhibits, describe quite precisely the location and extent of the easement to be taken. (Civ. Code, § 1001, subd. (c)(1); § 1245.340, subd. (b).) Paragraphs 13 and 14 explain the great necessity for L & M's taking of the easement (§ 1245.325, subd. (b)(1)), while paragraph 15 justifies the location selected for the taking (Civ. Code, § 1001, subd. (c)(2); § 1245.325, subd. (b)(2)). Finally, paragraph 16 presents the Council's assessment of the relative hardships the parties would bear if the taking was either disapproved or permitted. (Civ. Code, § 1001, subd. (c)(3); § 1245.325, subd. (b)(3).) The pertinent evidence supporting these findings also appears in the Council's resolution. (See ¶¶ 2, 4-8, 13-16.) That evidence was presented to the Council by its staff and the parties at the hearings on August 14 and 28. Taken together with the other evidence presented to the Council at those hearings (see part I, *ante*), we conclude the Council's findings were supported by substantial evidence.

IV

RATE OF INTEREST

In their final argument Ferreira and Milgen contend the lower court violated their rights to "just compensation" under the Fifth and Fourteenth Amendments to the United States Constitution by applying the legal rather than market rate of interest to their $8,400 condemnation award. Authority exists for awarding interest at either rate. (Legal rate: *Brown* v. *United States* (1923) 263 U.S. 78, 86-87 [68 L.Ed. 171, 182, 44 S.Ct. 92]; *United States* v. *Baugh* (5th Cir. 1945) 149 F.2d 190, 193; see also 3 Nichols on Eminent Domain (3d rev. ed. 1981) § 8.63[3] at pp. 8-360 to 8-362; market rate; *United States* v. *429.59 Acres of Land* (9th Cir. 1980) 612 F.2d 459, 464, 465; *United States* v. *Blankinship* (9th Cir. 1976) 543 F.2d 1272, 1276-1277.) Ferreira and Milgen argue, in essence, they have not received an adequate return on their condemnation award. They do not challenge the adequacy of the award itself. In the particular circumstances of this case, we need not resolve the constitutional issue Ferreira and Milgen raise. In addition to 7 percent legal interest, Ferreira and Milgen have received value from remaining in possession until after L & M deposited the balance due

them under the judgment of condemnation. (See § 1268.330, subd. (a).)[6] Given their receipt of legal interest plus use of the property, Ferreira and Milgen cannot complain they have received an inadequate return on their condemnation award. As a practical matter, their return has been sufficient.

V

DISPOSITION

Judgments affirmed.

Cologne, Acting P. J., and Lewis, J.,* concurred.

A petition for a rehearing was denied October 5, 1983.

APPENDIX<br>Resolution No. 9753

RESOLUTION OF THE CITY COUNCIL OF THE CITY OF CHULA VISTA CONSENTING TO THE ACQUISITION OF AN APPURTENANT EASEMENT IN PROPERTY AT VILLA SAN MIGUEL BY MEANS OF EMINENT DOMAIN

The City Council of the City of Chula Vista does hereby resolve as follows:

[1] WHEREAS, L & M Professional Consultants, Inc. (hereinafter "L & M") is engaged in the development and construction of a residential subdivision in the City of Chula Vista, State of California, more commonly known as Villa San Miguel, Chula Vista Tract 79-15, and

[2] WHEREAS, there presently exists no sewer hookup capable of servicing said tract, and

[3] WHEREAS, the development and construction of said tract is in the public interest, and for the benefit of the City of Chula Vista, and

[4] WHEREAS, said tract cannot be developed for human habitation without the provision of adequate sanitation facilities, and

[5] WHEREAS, the public interest, and good sanitation and engineering practices make the use of septic systems or other alternatives to the connection of this tract with the sewer system of the City of Chula Vista at this location neither desirable nor feasible, and

[6] WHEREAS, the public interest, and good sanitation and engineering practices require that said tract obtain adequate access to the sewer system of the City of Chula Vista, and

[7] WHEREAS, the public interest requires the provision of adequate drainage facilities to insure that runoff will not accumulate on adjacent parcels, but rather can be adequately channeled into the storm drains of the City of Chula Vista, and

[8] WHEREAS, the City has studied various alternatives for the provision of sewer and drainage for said property, and

[9] WHEREAS, the most feasible path for a sewer hookup and drainage is found to run from the northerly corner of said project in a generally northerly direction to Bonita Glen

---

[6] L & M has not cross-appealed the interest awarded Ferreira and Milgen.

*Assigned by the Chairperson of the Judicial Council.

Drive, as shown on the plat map attached hereto as Exhibit "A" and as further described in the attached legal description, Exhibit "B", and

[10] WHEREAS, said proposed easement traverses a portion of Lot 1, Sunny Vista Map No. 2207, which land is held in fee title, according to the latest equalized assessment role, by Mr. Frank Ferreira and Milgen Investment Company, and

[11] WHEREAS, L & M possesses the right to acquire said easement by the use of the power of eminent domain, pursuant to Divil [sic] Code Section 1001 and Sections 1245.310, et seq. of the Code of Civil Procedure, provided that the City of Chula Vista consent to said acquisition as required by Sections 1245.330, 1245.340, 1245.350 and 1245.360 of the Code of Civil Procedure, and

[12] WHEREAS, L & M has requested the City of Chula Vista to authorize the commencement of proceedings in the [sic] eminent domain for the acquisition of said easement, and

[13] WHEREAS, there is a great necessity for the acquisition of said easement in that without the acquisition of said easement Villa San Miguel will lack connection to the sewer system of the City of Chula Vista, creating a public health and sanitation hazard and rendering completion of said tract for the use and enjoyment of the citizens of the City of Chula Vista impossible, and

[14] WHEREAS, there is also a great necessity for the taking of said easement in that the drainage portion of said easement is necessary for the protection of adjacent landowners from erosion, runoff, flooding, inundation, and attendant sanitation problems, and

[15] WHEREAS, the configuration and location of said easement as shown on Exhibits "A" and "B" affords the most reasonable service to the property to which it is appurtenant, consistent with the least damage to the burdened property because said easement is located in such a fashion to correspond with the proposed alignment of the driveway to be used for the development of the subject property by the owner and, therefore, will provide easy access for maintenance and will have the least interference with the use of the property and can be developed in such a manner so as to assure adequate flowage and proper hydraulic entry to the sewer and storm drain systems of the City of Chula Vista and will, therefore, achieve the necessary public purpose intended and constitute the most minimal and reasonable degree of interference with the use and enjoyment of the burdened property, and

[16] WHEREAS, the hardship to the owner of the appurtenant property, if the taking is not permitted, will be substantial, in that the investment in the development of Villa San Miguel will be seriously impaired or lost and the hardship to the owner of the burdened property is minimal, in that the easement is located in such a fashion as to minimize interference with the reasonable use and enjoyment of the burdened property and the hardship to the owner of the appurtenant property, if the taking is not permitted, clearly outweighs any hardship to the owner of the burdened property, and

[17] WHEREAS, the property described in the resolution is necessary for the proposed projects.

Now, THEREFORE, BE IT RESOLVED that the City Council of the City of Chula Vista does hereby consent to the acquisition of the above-described easement by L & M by the institution of proceedings in eminent domain and this resolution is intended to comply with Section 1245.330 of the Code of Civil Procedure.